NOTICE: All slip opinions and orders are subject to formal revision and are superseded by the advance sheets and bound volumes of the Official Reports. If you find a typographical error or other formal error, please notify the Reporter of Decisions, Supreme Judicial Court, John Adams Courthouse, 1 Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-1030; SJCReporter@sjc.state.ma.us

SJC-12018

KAREN PARTANEN  vs.  JULIE GALLAGHER.


Middlesex.     April 5, 2016. - October 4, 2016.

Present:  Gants, C.J., Spina, Cordy, Botsford, Duffly, Lenk, & Hines, JJ.[1]


Parentage.  Statute, Construction.


Complaint in equity filed in the Middlesex Division of the Probate and Family Court Department on October 17, 2014.

A motion to dismiss was heard by Jeffrey A. Abber, J.

The Supreme Judicial Court granted an application for direct appellate review.


Mary Lisa Bonauto (Elizabeth A. Roberts, Teresa Harkins La Vita, Patience Crozier, & Joyce Kauffman with her) for the plaintiff.
Jennifer M. Lamanna for the defendant.
The following submitted briefs for amicus curiae:
C. Thomas Brown for Greater Boston Legal Services & others.
Emily R. Shulman, Brook Hopkins, & Adam M Cambier for American Academy of Assisted Reproductive Technology Attorneys & others.

---

[1] Justices Spina, Cordy, and Duffly participated in the deliberation on this case prior to their retirements.

Abigail Taylor, Gail Garinger, Brittany Williams, & Andrea C. Kramer, Assistant Attorneys General, for the Attorney General.

Shannon Minter, of California, Marco J. Quina, & Emma S. Winer for forty-two law professors & another.

LENK, J.  In 2014, the plaintiff, Karen Partanen, filed a complaint in the Probate and Family Court seeking to establish legal parentage of two young children.  The complaint alleged that she and the defendant, Julie Gallagher, had been in a committed, nonmarital relationship between 2001 and 2013.  Using in vitro fertilization, and with Partanen's "full acknowledgment, participation, and consent," Gallagher gave birth to the two children.  Thereafter, Partanen and Gallagher represented themselves publicly as the children's parents, and jointly raised the children until their 2013 separation.  On the basis of these allegations, Partanen's complaint sought a declaration of parentage pursuant to, among other things, G. L. c. 209C, § 6 (a) (4).  That statute provides that "a man is presumed to be the father of a child" born out of wedlock if "he, jointly with the mother, received the child into their home and openly held out the child as their child."  Concluding that Partanen could not be deemed a presumed parent under G. L. c. 209C, § 6 (a) (4), because it was undisputed that she was not the children's biological parent, a judge of the Probate and Family Court dismissed the complaint for failure to state a

claim upon which relief can be granted. See Mass. R. Dom. Rel. P. 12(b)(6).

In addressing Partanen's claims on direct appellate review, we consider the question whether a person may establish herself as a child's presumptive parent under G. L. c. 209C, § 6 (a) (4), in the absence of a biological relationship with the child. We conclude that she may. We conclude further that, here, the assertions in Partanen's complaint are sufficient to state a claim of parentage under G. L. c. 209C (statute). Therefore, we reverse the judgment of dismissal and remand the matter to the Probate and Family Court for further proceedings.[2]

1. Background. The facts are largely undisputed. The following facts are drawn from the complaint, which we take as true in reviewing a dismissal under Mass. R. Dom. Rel. P. 12(b)(6), with certain minor, undisputed details drawn from elsewhere in the record. See Schaer v. Brandeis Univ., 432 Mass. 474, 477 (2000).

---

[2] Because we conclude that Karen Partanen's complaint is sufficient to establish parentage under G. L. c. 209C, § 6, and should not have been dismissed, we do not address her claims that she is entitled to a declaration of parentage under G. L. c. 46, § 4B (presumptive parentage of child born through artificial reproductive technology to married couple), or, alternatively, under G. L. c. 215, § 6 (court's equitable power to establish parentage). For the same reason, we do not address Partanen's constitutional claims. See Matter of McKnight, 406 Mass. 787, 797 (1990) ("this court is not likely to resolve an issue on constitutional grounds if the court may dispose of it by a consideration of rights created by statute").

In February, 2001, while they were both living in Massachusetts, Partanen and Gallagher entered into a committed relationship. They moved to Florida in 2002, and, the following year, together purchased a house there. In 2005, they decided to start a family "with the shared intention that they would both be parents to the resulting children." That year, Partanen unsuccessfully underwent fertility treatment using a sperm donor and in vitro fertilization. In 2007, Gallagher underwent similar treatment "with the full acknowledgment, participation, and consent of" Partanen. This treatment was successful, and, with Partanen present, Gallagher gave birth to a daughter, Jo.[3] In 2011, Gallagher again underwent fertility treatment, "with the full acknowledgment, participation, and consent of" Partanen.[4] The treatment was successful, and, in 2012, Gallagher gave birth to a son, Ja.

Though Partanen did not formally adopt the children,[5] she participated in raising them from the time of their birth. Her participation included "waking for night-time feedings, bathing, meal preparation, grocery shopping, transportation to/from day

---

[3] We refer to the children by pseudonyms.

[4] The plaintiff participated in the insemination procedure, injecting the sperm that would lead ultimately to the defendant's second pregnancy.

[5] In 2010, adoption became available to same-sex couples in Florida. See Florida Dep't of Children & Families v. Adoption of X.X.G., 45 So. 3d 79 (Fla. Dist. Ct. App. 2010).

care and school, staying home with the children during times of illness, clothes shopping, providing appropriate discipline as necessary, addressing their developmental needs, [and] comforting" them.  Partanen was involved also "in all decision-making for the children," including in matters related to their education and healthcare.  Partanen "provided [the children] consistent financial support," and both children referred to Partanen as "Mommy."  Partanen and Gallagher represented themselves publicly as the children's parents in formal contexts such as at the children's schools and for medical appointments, as well as in their interactions with friends and family.  They vacationed as a family, shared expenses, purchased joint assets, and sent family holiday cards.

In May, 2012, after the birth of Ja, Partanen and Gallagher returned to Massachusetts with the children.[6]  In November, 2013, the couple separated, and Partanen moved out of the family home.  Partanen filed an action to establish de facto parentage in February, 2014.  She requested visitation with the children and shared legal custody.  In September, 2015, a judge of the Probate and Family Court ruled that Partanen was a de facto

---

[6] Although same-sex marriage was then possible in Massachusetts, see Goodridge v. Dep't of Pub. Health, 440 Mass. 309 (2003), Partanen and Gallagher did not marry.

parent of the children, issued orders regarding visitation, and required her to pay child support.[7]

In October, 2014, Partanen filed the present action in the Probate and Family Court "to establish [full legal] parentage."[8] In February, 2015, Gallagher's motion to dismiss the complaint for "[f]ailure to state a claim upon which relief can be granted," Mass. R. Dom. Rel. P. 12(b)(6), was allowed.

2. Discussion. a. Standard of review. In reviewing the dismissal of a complaint pursuant to Mass. R. Dom. Rel. P. 12(b)(6), "[w]e accept as true the facts alleged in the . . . complaint as well as any favorable inferences that reasonably can be drawn from them." See Polay v. McMahon, 468 Mass. 379, 382 (2014), quoting Galiastro v. Mortgage Elec. Registration Sys., Inc., 467 Mass. 160, 164 (2014).[9]

b. Statutory language. General Laws c. 209C, § 1, provides "[c]hildren born to parents who are not married to each

---

[7] That action is the subject of a separate appeal, and is not before us.

[8] See A.H. v. M.P., 447 Mass. 828, 843 (2006) ("a de facto parent" is not "afforded all of the privileges of a legal parent" [citation omitted]).

[9] We address Partanen's claim under Massachusetts law. Gallagher's contention that Florida law governs was not raised in the Probate and Family Court, and therefore is waived. See Adoption of Peggy, 436 Mass. 690, 698, cert. denied, 537 U.S. 1020 (2002) (claim regarding choice of law waived). See also Hunter v. Rose, 463 Mass. 488 (2012) (applying Massachusetts law, including G. L. c. 209C, where child was conceived and born out-of-State using artificial reproductive technology).

other" "a means" to obtain an "adjudication of their
[parentage.]"[10]  Actions to establish parentage under G. L.
c. 209C may be brought by, among others, "a person presumed to
be" the child's parent.  See G. L. c. 209C, § 5 (enumerating
persons entitled to bring actions to establish "paternity,
support, visitation or custody of a child" born out of wedlock);
G. L. c. 209C, § 6 (defining presumed parentage).  Here,
Partanen contends that she is "presumed to be" the children's
mother, and therefore may pursue an action for parentage.

To survive a motion to dismiss, Partanen must allege facts
sufficient to establish that she is a "presumed parent" under
G. L. c. 209C, two provisions of which are relevant here.
First, she must allege that Jo and Ja are "children" as that
term is used in the statute, i.e., people "born to a man and
woman who are not married to each other."  See G. L. c. 209C,
§ 1.  Read in gender-neutral terms, see G. L. c.  209C, § 21;
G. L. c. 4, § 6, Fourth, this requires an allegation that the

_____

[10] While G. L. c. 209C, "Children Born Out of Wedlock," uses
the gendered phrase "adjudication of paternity," see G. L.
c. 209C, § 1, we interpret the statute as providing a means for
establishing parentage regardless of the parent's gender.  See
Hunter v. Rose, supra at 493 (applying G. L. c. 209C in context
of relationship between two women); G. L. c. 4, § 6, Fourth (in
all statutes, "words of one gender may be construed to include
the other gender and the neuter").  See also G. L. c. 209C, § 21
(in "an action to determine the existence of a mother and child
relationship," "the provisions of this chapter applicable to
establishing paternity shall apply").

children were "born to [two people] who are not married to each other."

Second, Partanen must allege adequately that she satisfied the "holding out" provision of G. L. c. 209C, § 6 (a), which states:

> "(a) In all actions under this chapter a man is presumed to be the father of a child . . . if:
>
> ". . .
>
> "(4) while the child is under the age of majority, he, jointly with the mother, received the child into their home and openly held out the child as their child."

In gender-neutral terms, Partanen must allege that she, "jointly with the mother [i.e., Gallagher], received the child[ren] into their home, and openly held out the child[ren] as their child[ren]."

Partanen maintains that the facts alleged in her complaint satisfy both the "born to" and "holding out" provisions. With respect to the requirement that the children be "born to" two people, G. L. c. 209C, § 1, Partanen asserts that the children were born both to her and to Gallagher, because Gallagher's pregnancies and the children's births took place with Partanen's "full acknowledgment, participation, and consent."[11] She asserts

---

[11] It is undisputed that the children were not "born to" their genetic fathers, the sperm donors. See Adoption of a Minor, 471 Mass. 373, 378 n.8 (2015) ("sperm donor may assert parentage only where he donates . . . 'with the intent to be the parent of [the] child'" [citation omitted]).

also, with respect to the "holding out" provision, that she and Gallagher jointly received the children into their home and openly held out the children as theirs.  See G. L. c. 209C, § 6 (a).  Gallagher contends, however, that Partanen's complaint cannot survive a motion to dismiss because the provisions of G. L. c. 209C -- and, in particular, those in G. L. c. 209C, § 6, concerning presumed parentage -- were intended only as a means of establishing biological parentage, and are inapplicable where, as here, it is known that no biological connection exists.

The question we must address, then, is whether Partanen may establish that she is the children's "presumed parent" under G. L. c. 209C, § 6 (a), by alleging that the children were born to her and to Gallagher, were received jointly into their home, and were openly held out as the couple's children, where it is known that she has no biological relationship to the children.

c.  Statutory construction.  As with all statutes, G. L. c. 209C must be construed "according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be

effectuated."  Seideman v. Newton, 452 Mass. 472, 477 (2008),

quoting Hanlon v. Rollins, 286 Mass. 444, 447 (1934).

We turn first to the statutory language.  See Associated

Subcontractors of Mass., Inc. v. University of Mass. Bldg.

Auth., 442 Mass. 159, 164 (2004) ("As always, our analysis

begins with the statutory language . . .").  While the

provisions at issue speak in gendered terms, they may be read,

as discussed, in a gender-neutral manner, to apply where a child

is "born to [two people]," G. L. c. 209C, § 1, is received into

their joint home, and is held out by both as their own child.

See G. L. c. 209C, § 6 (a).  The plain language of the

provisions, then, may be construed to apply to children born to

same-sex couples, even though at least one member of the couple

may well lack biological ties to the children.[12]

---

[12] Gallagher argues that, even under a reading that applies these provisions to same-sex couples, a biological link to the child still could be required, since two women might each have such a link:  one by having provided the ovum and the other by having carried the child.  Here, Partanen has no biological link to the children, as she was neither the egg donor nor the carrier.  Nonetheless, properly read as gender-neutral, G. L. c. 4, § 6, Fourth, these provisions may apply not only to a child born to two women, but also to a child born to two men through a surrogacy arrangement.  In such a situation, at least one of the men will be unable to form a direct biological relationship with the child in the manner that Gallagher suggests, since only one can directly contribute his genetic material (though the other may do so indirectly, by asking a female relative to provide the egg), and neither can carry the child.

Nothing in the language of G. L. c. 209C expressly limits its applicability to parentage claims based on asserted biological ties. See Chin v. Merriot, 470 Mass. 527, 537 (2015) ("We will not 'read into the statute a provision which the Legislature did not see fit to put there'" [citation omitted]). This silence is particularly significant because G. L. c. 209C is a remedial statute, see Flynn v. Connors, 39 Mass. App. Ct. 365, 368 n.9 (1995) (G. L. c. 209C should be read to "extend to cases within the reason, if not the letter, of the statute"), which must "be given a broad interpretation . . . in light of its purpose and to 'promote the accomplishment of its beneficent design'" (citation omitted). See Meikle v. Nurse, 474 Mass. 207, 210 (2016). The statute's purpose, laid out in its first sentence, is to provide all "[c]hildren born to parents who are not married to each other . . . the same rights and protections of the law as all other children." G. L. c. 209C, § 1.

Here, had Jo and Ja been born to a married couple using artificial reproductive technology, they would have had two legal parents to provide them with "financial and emotional support." See Hunter v. Rose, 463 Mass. 488, 493 (2012), citing G. L. c. 46, § 4B (children born to one same-sex spouse are legal children of both spouses, even where one not biologically related to children). We decline to "read into the statute a provision," see Chin v. Merriot, supra, that leaves children

born to unmarried couples, using the same technology, with only one such parent.  Cf. Smith v. McDonald, 458 Mass. 540, 546 (2010) ("While a statute governing divorced children is not applicable directly to nonmarital children, the legal equality of nonmarital children pursuant to G. L. c. 209C, § 1, dictates the same rule apply for children in comparable circumstances").

That the presumption of parentage in G. L. c. 209C, § 6 (a) (4), may be construed to apply even where biological ties to the children are absent is consistent with our construction of other provisions in the statute.  See Phillips v. Pembroke Real Estate, Inc., 443 Mass. 110, 117 (2004) ("we look to other provisions of the statute for indicia of [legislative] intent, and for the purpose of interpreting the statute as a consistent whole").  For example, in Hunter v. Rose, supra, we applied another of the parentage presumptions in G. L. c. 209C, § 6 (a) -- that "a man is presumed to be the father" if "the child was born during [the father's] marriage" to the mother -- to a child born to two married women, one of whom had no biological relationship to the child.

We also have interpreted another provision in the statute, G. L. c. 209C, § 11 (a), as recognizing parentage in the absence of a biological relationship.  That section provides that parentage may be established through a "written voluntary acknowledgement of parentage executed jointly by the putative

father . . . and the mother of the child," id., and we have said that a father validly may execute such an acknowledgment absent a genetic relationship.[13]  See Paternity of Cheryl, 434 Mass. 23, 32 (2001) (man could not rescind acknowledgment of paternity years after signing it merely because genetic testing showed him not to be biologically related to child).  In that case, we explained that a "man may acknowledge paternity for a variety of reasons," that "we cannot assume that biology is the sole impetus in every case," and that, in proceedings under G. L. c. 209C, "consideration of what is in a child's best interests will often weigh more heavily than the genetic link between parent and child."  Paternity of Cheryl, supra at 31-32.

From this, it is apparent that a biological connection is not a sine qua non to the establishment of parentage under G. L. c. 209C.  Indeed, Gallagher concedes that a voluntary acknowledgment of parentage may be executed by a same-sex couple, even if one member of the couple is not biologically related to the children, and that, had an acknowledgment been

---

[13] The acknowledgment at issue in Paternity of Cheryl, 434 Mass. 23 (2001), was executed before the substantial 1998 amendments to G. L. c. 209C, § 11.  See St. 1998, c. 64, § 205, "An Act to improve the Massachusetts child support enforcement program."  We recognized that our decision in that case was consistent with the Legislature's clear intention in amending G. L. c. 209C, § 11, to limit the ability of a voluntary signatory to an acknowledgment to challenge its validity at some later time.  See Paternity of Cheryl, supra at 29, 39.

executed here, it would have established Partanen as the children's legal parent.

Notwithstanding this assertion, however, Gallagher contends that, even if Partanen satisfies the "holding out" provision of G. L. c. 209C, § 6 (a), any presumption created on this basis may be rebutted by evidence that she lacks a biological connection to the children, i.e., that the children were not "born to" her. See G. L. c. 209C, § 1. Gallagher's argument apparently is rooted in G. L. c. 209C, § 17, which provides that in "an action under this chapter to establish [parentage] of a child born out of wedlock, the court shall, on motion of a party and upon a proper showing . . . order the . . . putative [parent] to submit to one or more genetic marker tests." Thus, Gallagher claims that she might seek an order to have Partanen undergo such testing, and thereby rebut any presumption of parentage created under G. L. c. 209C, § 6 (a).[14]

---

[14] Gallagher points also to two other provisions in G. L. c. 209C that, she maintains, indicate the Legislature's intent to limit the statute's applicability to biological children. See G. L. c. 209C, § 8 (default judgment establishing parentage may enter against father only if "the mother or putative father submits that sexual intercourse between the parties occurred during the probable period of conception"); G. L. c. 209C, § 11 (a) (if parent attempts to rescind voluntary acknowledgement of parentage, "the court shall order genetic marker testing"). To the extent that these provisions focus on proving or disproving a biological relationship, they are applicable only where the underlying parentage claim is based on biology, and not, as here, where the claim is made on another basis. See G. L. c. 209C, § 11 (a) (genetic testing mandatory

This claim is unavailing. The statute's language expressly conditions an order of genetic testing on "a proper showing" by the moving party. G. L. c. 209C, § 17. Where, as here, the parentage claim is not based on a genetic relationship, Gallagher, as the moving party, cannot show such testing would be relevant to the claim at issue, and, therefore, no "proper showing" is possible.[15] See Elisa B. v. Superior Court, 37 Cal. 4th 108, 122 (2005) (while statute allows rebuttal of presumed parentage by genetic testing in "an appropriate action," case where parentage claim is not based on biological connection "is not 'an appropriate action' in which to rebut the presumption of presumed parenthood with proof that [plaintiff] is not the [children's] biological parent"). See also Chatterjee v. King, 280 P.3d 283, 294-295 (N.M. 2012).

---

only where acknowledgement of parentage "constitute[s] the proper showing required for an order to submit to such testing," i.e., where biological relationship is at issue); Culliton v. Beth Israel Deaconess Med. Ctr., 435 Mass. 285, 290 (2001) (evidence of occurrence of intercourse under G. L. c. 209C, § 8, not relevant to parentage claim where pregnancy is result of "reproductive advances[, which] have eliminated the necessity of having sexual intercourse in order to procreate").

[15] That the parentage presumption may not be rebutted through genetic testing, however, does not mean that it cannot be rebutted in other ways. Rebuttal may be accomplished by proof that the child, even if held out by the putative parent as his or her own, was not actually "born to" that parent. See G. L. c. 209C, § 1. For example, here, Gallagher might show that Partanen's assertions about her having consented to the inseminations, and about her involvement in the ensuing pregnancies and births, are untrue.

Gallagher cites a number of cases to support her contention that a biological relationship is necessary to establish parentage under G. L. c. 209C.  In one of these, C.M. v. P.R., 420 Mass. 220 (1995), we held that a man was not a legal parent under G. L. c. 209C to a child born to his nonmarital partner, where the child was conceived before their relationship began. We based this conclusion on an assumption that, "[b]y definition," paternity cannot be established under G. L. c. 209C by "a person who is not the biological father of a child."  See C.M. v. P.R., supra at 223.  We since have made clear, however, that this assumption is incorrect.  See Paternity of Cheryl, 434 Mass. at 34 (judgment of paternity under G. L. c. 209C  may be upheld "even though [putative father] may establish conclusively that he is not a child's genetic parent").

 Gallagher also cites two decisions that postdate Paternity of Cheryl.  One concerns notably different factual circumstances from those at issue here.  See T.F. v. B.L., 442 Mass. 522, 527- 531 (2004) (woman not required, under contract law, to pay child support to former same-sex partner for child born after their separation; child was never received into their joint home or held out as child of both women).  In the other, R.D. v. A.H., 454 Mass. 706, 714 (2009), we held that a de facto parent did not have the same right to custody as a full legal parent under G. L. c. 209C, § 10, and therefore could not obtain custody

against the wishes of such a parent, because "the term 'parent' [as used in that statute] refers to a biological parent" rather than to a de facto parent. In the context of that case, our intention was evident: to distinguish a de facto parent from a legal parent. We did not intend to suggest that G. L. c. 209C is limited only to parentage based on biology. Indeed, the result there would have been the same had the de facto parent sought custody against the wishes of a nonbiological adoptive parent. See G. L. c. 210, § 6 (adoptive parent has "all rights, duties and other legal consequences of" parentage).

Gallagher contends also that allowing Partanen's claim to proceed intrudes on Gallagher's "right [as] a single woman to give birth to a child into a family framework of her own choosing."[16] The question in this case, however, is not whether courts may impose a second parent onto a single-parent family, but whether this was, in fact, a single-parent family in the first place. Partanen's allegation is that, from the beginning, the children had two parents, both of whom were jointly involved in the children's lives.

---

[16] Gallagher notes that the Legislature has required insurance companies to cover fertility treatments and has not limited this requirement to married or partnered women, suggesting, in her view, a policy of protecting the rights of single women to create a family in the absence of a second parent. See, e.g., G. L. c. 175, § 47H.

Moreover, while Gallagher has an acknowledged interest in constructing "a family framework of her own choosing," the statute at issue was enacted for the benefit of children born outside the context of marriage, see G. L. c. 209C, § 1, whose "welfare is promoted by ensuring that [they] ha[ve] two parents to provide . . . financial and emotional support."[17]  See Hunter v. Rose, 463 Mass. at 493.  As another court has observed,

> "paternity presumptions are driven, not by biological paternity, but by the [S]tate's interest in the welfare of the child and the integrity of the family. . . .  The familial relationship between a nonbiological [parent] and [a] child . . . , resulting from years of living together in a purported parent/child relationship, is considerably more palpable than the biological relationship of actual paternity and should not be lightly dissolved" (citations omitted).

In re Guardianship of Madelyn B., 166 N.H. 453, 461 (2014).

We note, in this regard, that courts in other jurisdictions have read comparable provisions to establish presumed parentage in the absence of biological relationships, and have done so, in

___

[17] Gallagher contends that the purpose of the statute will be ensured through the adjudication of Partanen as a de facto parent, and that full legal parentage will not provide significant additional benefits.  This contention is inconsistent with established case law.  See A.H. v. M.P., 447 Mass. at 843 ("a de facto parent" is not "afforded all of the privileges of a legal parent" [citation omitted]).  See also R.D. v. A.H., 454 Mass. 706, 711 (2009) (full legal parent may obtain primary custody over other parent's objection where in best interests of child; de facto parent may obtain such custody only if legal parent first found to be unfit); American Law Institute, Principles of the Law of Family Dissolution: Analysis and Recommendations § 3.10 & comment c (2002) (limiting circumstances in which de facto parent is liable for child support).

part, out of concern for the welfare of children born out of wedlock.[18]  See, e.g., <u>Elisa B</u>. v. <u>Superior Court</u>, 37 Cal. 4th at 120, 122 ("The circumstance that [former member of same-sex couple pursuing parentage claim] has no genetic connection to the twins does not . . . mean that she did not hold out the twins as her . . . children" and that she is not their presumed parent; "[r]ebutting the presumption that [she] is [their] parent would leave them with only one parent and would deprive them of the support of their second parent"); <u>In re Parental Responsibilities of A.R.L.</u>, 318 P.3d 581, 584, 587 (Colo. Ct. App. 2013) (female former same-sex partner, not biologically related to child, may pursue parentage claim under provision that "a man is presumed to be the father of a child if 'he receives the child into his home and openly holds out the child as his natural child'"; "[t]his interpretation is supported . . . by the compelling interest children have in the love, care, and support of two parents, rather than one, whenever possible [citation omitted]); <u>In re Guardianship of Madelyn B</u>., 166 N.H. at 460, 462 (former same-sex partner, not

---

[18] See also <u>Frazier</u> v. <u>Goudschaal</u>, 296 Kan. 730, 747 (2013) ("female can make a colorable claim to being a presumptive mother of a child without claiming to be the biological or adoptive mother" under provision that person is presumed parent if she "notoriously . . . recognizes [the parentage] of the child" [citation omitted]).  The court in that case reached this result based on constitutional considerations that we need not address here.  See <u>id</u>. at 754.

biologically related to child, may pursue parentage claim because she "adequately pleaded that she received [the child] into her home and openly held [the child] out as her child"; were this not so, "a child in a situation similar . . . could be entitled to support from, and be the legitimate child of, only her birth mother"); Chatterjee v. King, 280 P.3d at 293, 296 (former same-sex partner, not biologically related to child, may pursue parentage claim because "her allegations satisfy the hold out provision of" statute; "the child's best interests are served when intending parents physically, emotionally, and financially support the child").  See also Uniform Parentage Act § 703 (2002) (person who "consents to . . . assisted reproduction by a woman . . . with the intent to be the parent of her child . . . is a parent of the resulting child"); id. at § 703 comment ("This provision reflects the concern for the best interests of nonmarital as well as marital children . . .").

Having determined that a person without a biological connection to a child may be that child's presumed parent under G. L. c. 209C, § 6 (a), we must decide whether, in this case, Partanen adequately has alleged that she is such a parent.  We conclude that she has.  Partanen was required to allege, first, that the children were born both to Gallagher and to her.  See G. L. c. 209C, § 1.  In this regard, Partanen claims that both of Gallagher's pregnancies were undertaken "with the full

acknowledgment, participation, and consent of" Partanen, and "with the shared intention that [the defendant and plaintiff] would both be parents to the resulting children."  She states also that she was present in the delivery room when the children were born.  These allegations suffice to establish, for purposes of Mass. R. Dom. Rel. P. 12(b)(6), that the children were born both to her and to Gallagher.  See Elisa B. v. Superior Court, 37 Cal. 4th at 125 (nonbiological mother "actively participated in causing the children to be conceived with the understanding that she would raise the children as her own together with the birth mother"); In re Guardianship of Madelyn B., 166 N.H. at 462 (both parties "planned to have and raise children together," "prepar[ing the child's] nursery together in the home they had jointly purchased"; nonbiological mother "was in the delivery room").

Partanen was required also to allege that she and Gallagher "received the child into their home and openly held out the child as their child."  G. L. c. 209C, § 6 (a) (4).  In her complaint, Partanen asserts that she helped raise the children in the home she shared with Gallagher, that she participated actively in the care and nurturing of the children from the moment of their birth, that she was involved in key decisions, that she and Gallagher represented themselves to others -- both in formal and informal contexts -- as the children's parents,

and that the children refer to her as "Mommy."  These allegations, too, are sufficient.  See Elisa B. v. Superior Court, supra (nonbiological mother "voluntarily accepted the rights and obligations of parenthood after the children were born"); In re Guardianship of Madelyn B., supra at 463 (nonbiological mother was called "Momma," "appeared 'to the world' to be [child]'s parent," and was referred to as such in child's "school and medical records").

3.  Conclusion.  The judgment of dismissal is reversed, and the case is remanded to the Probate and Family Court for further proceedings consistent with this opinion.

So ordered.